Mappes vs. The Board of Supervisors of Iowa County.

MAPPES VS. THE BOARD OF SUPERVISORS OF IOWA COUNTY.

COUNTIES: PAUPERS. *Liability of county for maintenance of pauper.*

1. Under sec. 1, ch. 34, R. S. 1858, every town was primarily under a legal obligation to relieve and support all indigent persons having a lawful settlement therein; and where, in any county, proper action was taken by the county supervisors as authorized by that statute (sec. 32), to "abolish the distinction between county poor and town poor in such county, and have the expense of maintaining all the poor therein a county charge," this legal obligation was transferred to the county.

2. The fact that a county, in such a case, had procured (under the same chapter) an order from the county judge upon one or more relatives of a pauper, requiring him or them to contribute a certain amount weekly for the maintenance of such pauper, would not, as to other persons, relieve the county from its primary liability for such maintenance.

3. Where, therefore, after such an order had been procured, a pauper was removed from the county poor-house, by order of one of the superintendents of the county poor, and, being also refused a home and support by her relatives, was boarded and cared for by the plaintiff at his public house for some time before he discovered that she was a pauper: *Held*, that the county was liable to him for her maintenance.

APPEAL from the Circuit Court for *Iowa* County.

Plaintiff filed with the board of supervisors of Iowa county his account, duly verified, against said county, for the board and support of Ann Clayton, a pauper of said county, for a period of fifteen weeks ending July 6, 1875. The total debit was $75; and there were credits for cash payments by James and Joseph Conley, respectively, amounting together to $25; leaving a balance of $50. The account was disallowed, and thereupon plaintiff brought this action to recover the amount.

The court found certain facts which will sufficiently appear from the opinion, and also the following facts: 6. That about ten days after Ann Clayton became an inmate of his hotel, plaintiff was informed that she was a pauper having a legal residence in Iowa county. 7. That $5 a week was a reasonble charge for her care and support. 8. That no arrangement

had ever been entered into by the superintendents of the poor of said county with any person for her care and support. As conclusions of law, the court held that it was plaintiff's duty, after receiving the information above stated, to notify the authorities of Iowa county within a reasonable time; that after such time he was not entitled to compensation for the extra care bestowed upon her; and that he was entitled to judgment for $10.

From a judgment rendered in accordance with this decision, defendant appealed.

The cause was submitted on the brief of *S. W. Reese* for the appellant, and that of *O. C. Smith*, with *Alexander Wilson*, of counsel, for respondent.

COLE, J. The statute clearly imposes the obligation upon every town of relieving and supporting all poor and indigent persons having a lawful settlement therein, whenever they shall stand in need of such support. Sec. 1, ch. 34, Tay. Stats. The law is founded upon the humane idea that a poor person has a right to live, and that when one, through age, disease or misfortune, is unable to procure the means of bodily subsistence, he shall not die from want or exposure, but the property of the town in which he resides shall be chargeable with the expense of his maintenance. The intent and policy of the law upon this subject are too plain to require comment. *Meyer v. The Town of Prairie du Chien*, 9 Wis., 234; *Town of Westfield v. Sauk County*, 18 id., 624. It seems that, by an arrangement made by the county board of supervisors, which the board was authorized to make under chapter 34, the obligation and expense of supporting the poor in Iowa county became chargeable upon the county. Of course, the burden, which would have otherwise rested upon the towns, of maintaining the poor, was shifted to the county. Thus far there is no room for controversy in this case. It is equally clear that

Mrs. Ann Clayton, at the time she was taken care of and boarded by the plaintiff, in the year 1875, was a poor and indigent person, within the meaning of the statute, and having a legal settlement in the town of Mifflin in said county. The fact is abundantly established by the testimony, and is not denied by the counsel for the defendant, that she had been an inmate of the county poor-house for several years prior to March, 1875. It appears that in October, 1868, the supervisors of the county took steps, under the statute, to compel her sons, Joseph and James Conley, to assist in supporting her. On application of the supervisors of the county, the county judge made an order requiring Joseph and James Conley each to pay the sum of $1.75 weekly to the county board for the support of their mother, which sum was afterwards reduced to $1.25 each per week. Thus the county authorities recognized and attempted to discharge the legal obligation resting upon them of taking care of this poor helpless woman; and it is not obvious upon what ground they expected to be exempted from their liability to pay the plaintiff the amount of his claim.

The learned attorney for the county insists that it clearly appears from the evidence that Mrs. Clayton, while she was an inmate of the county poor-house, was supported there in pursuance of a contract between her sons and the county authorities, and that the effect of this arrangement was to relieve the county from all responsibility of providing for her maintenance. We do not so understand either the facts or the law of the case. The statute contains provisions by which certain persons, having sufficient ability therefor, may be compelled to support in part or wholly their poor relatives. This is a compulsory proceeding to enforce what is deemed a natural duty, but it does not amount to a contract. It is a remedy in aid of a public liability, proper and just enough, but does not relieve the public of its obligation to support its paupers.

For, as we have said, the intent of the statute is to guard against the danger of anyone unable to support himself being left without the very means of sustaining life. Hence, the law wisely and humanely imposes upon the public the burden of providing for the necessities of its poor and destitute. But the fact that the law affords means of enforcing compulsory assistance from relatives in certain cases, does not take away the responsibility of the public in the matter. The primary obligation remains — in this case upon the county, — notwithstanding a remedy is afforded to enforce contribution on the part of relatives. And therefore, to our minds, the evidence is conclusive that Mrs. Clayton was a pauper if there ever was one; her support was chargeable upon Iowa county; and the fact that her sons were made to contribute in aid of the county burden, did not and could not relieve the county from its liability to provide for her support.

We do not deem it necessary, and it certainly is not pleasant, to dwell upon the facts disclosed in this record. The learned counsel for the plaintiff, in his brief, has commented on them with much severity of language, but, perhaps, not more so than the facts warranted. For when one considers the way in which this poor old woman was treated by the public authorities of the county, and neglected by her children, he feels a keen sense of shame and indignation, which it is not easy to repress or give utterance to in mild words. Here was a poor, blind, helpless woman, nearly one hundred years of age, utterly destitute, who had been a county charge since 1868. In the spring of 1874, she was taken from the county poor-house, the only home she had in the world, by direction of one of the superintendents of the poor of the county, and carried "with some goods" to where her children lived. "The goods" were put in a barn, and she was left in the public street "sitting on the woodpile." Her children turned her from their doors, and suffered her to wander about the country, and find shelter and

food where she could. In March, 1875, she was brought to the public house of the plaintiff, by some one who had sufficient regard for his name to conceal it, and thus save it from the stigma of a base act, and was left with the plaintiff with the false pretense that "she wanted to go off on the train to-morrow." There she was boarded and taken care of by the plaintiff for some time before he learned that she was a pauper, and had thus been imposed upon him by some one to relieve the public from the expense of maintaining her. For the board and lodging thus furnished her, the plaintiff charged the county with the amount claimed in his bill. Most of the claim was disallowed by the court below, as not being a proper charge against the county. As the plaintiff has not appealed, we cannot review this part of the judgment. But, in taking leave of the case, we are constrained to say, that the ingratitude of the children of this aged pauper, and the neglect of the public authorities in discharging their duties in respect to her, are complimentary neither to the affection and filial duty of the former, nor to the humanity and public duty of the latter. "Man's inhumanity to man" is not a mere figment of poetic genius.

*By the Court.* — The judgment of the circuit court is affirmed.